Jackie **KLEINER**

v.

The **FIRST NATIONAL BANK OF ATLANTA.**

George W. **MOROSANI**

v.

The **FIRST NATIONAL BANK OF ATLANTA.**

Civ. Nos. C80–921, C81–1553.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 28, 1984.

Robert B. Remar, Jonathan A. Zimring, Remar, Arnold & Zimring, Jerome J. Froelich, Jr., Kenneth P. McDuffie, Atlanta, Ga., for plaintiff Kleiner.

Jerome J. Froelich, Jr., Kenneth P. McDuffie, Atlanta, Ga., Michael P. Malakoff, Pittsburgh, Pa., for plaintiff Morosani.

Trammel E. Vickery, Kent Mast, William B.B. Smith, James A. Gilbert, Hansell, Post, Brandon & Dorsey, C.B. Rogers, Rogers & Hardin, Atlanta, Ga., for First National Bank of Atlanta.

## ORDER

ORINDA D. EVANS, District Judge.

These consolidated cases are before the court on the Plaintiffs' motion for partial summary judgment on their claims that the Bank breached its obligation to them by not charging interest on their loans in the manner set in the notes signed by Plaintiffs.[1] After consideration, the court finds that the record does not establish as a matter of law that the Bank breached an obligation to Plaintiffs or that Plaintiffs are otherwise entitled to recover. Therefore, the motion for partial summary judgment is DENIED.

The court has certified three plaintiff classes of borrowers—the "promissory note" class, the "real estate note" class, and the "per annum" class. *Id.* at 698, as amended by Orders of June 29, 1983 and February 4, 1984. Members of the promissory note class signed notes stating that interest would be paid at a rate of

_____ percent per annum in excess of the rate charged by [the] bank from time to time to its best Commercial borrowers with respect to ninety (90) day borrowings (the "Prime Rate").

Members of the real estate note class signed notes stating that interest would accrue at a rate of

_____ percent per annum plus the "prime rate" currently charged from time to time by [the bank] to its best and most credit worthy customers.... If at any time or from time to time such prime rate increases or decreases, then the rate of interest hereunder shall be correspondingly increased or decreased effective on the day on which any such increase or decrease of such prime rate is publicly announced. In the event that [the bank], during the term hereof, shall abolish or abandon the practice of publishing the prime rate, or should the same become unascertainable, Holder shall designate a comparable reference rate which shall be deemed to be the "prime rate" hereunder.

Members of the per annum class signed notes stating that interest was to be calculated on a "per annum" basis.

### I. *Promissory Note and Real Estate Note Claims*

Before turning to the specific issues presented, it is helpful to summarize certain basic contract principles which apply and also to summarize the parties' differing contentions.

 First, it is axiomatic that a note is a contract. Specifically, it is a unilateral form of contract in which the borrower, in exchange for the bank's act of lending money, makes a promise to repay the loan at a certain time with certain interest. Hence, the promises normally are made by the borrower, not the lender. Indeed, the lender usually does not sign the note. Since an action for breach of contract is based on breach of a promise, careful attention must be given to isolating exactly what express or implied promise, if any, the Bank made to Plaintiffs.

The contract analysis has a unique twist here because the notes did not specify a

---

1. The background of these cases is detailed in *Kleiner v. First National Bank of Atlanta,* 97 F.R.D. 683 (N.D.Ga.1983).

numerical rate of interest. Instead, they called for interest payments tied to the Bank's "prime rate," a rate set unilaterally by the Bank at variable intervals before and after execution of the notes. Thus these questions arise: Did the notes permit the Bank to set the prime rate at whatever numerical rate it chose, and require the customer to pay interest on his note accordingly? Or did the notes or any legal principle obligate the Bank to observe limitations in setting its prime rate? If so, what are those limitations?

The respective arguments of the parties are now summarized. Plaintiffs' argument is that in the above-quoted language from the notes, the Bank promised it would undertake to identify "its best Commercial borrowers with respect to ninety (90) day borrowings" (excerpt from the promissory note) and "its best and most credit worthy customers" (excerpt from the real estate note). Further, the Plaintiffs implicitly argue that the Bank committed to set its prime rate in accordance with the rate it was willing to charge these specifically identified customers. Since the Bank has admitted in discovery that it never has undertaken to identify its most creditworthy customers as a discrete group, and further has admitted that certain large corporate customers paid less than the "prime rate," Plaintiffs argue that the Bank has breached a contractual obligation. On that basis, they argue they are entitled to partial summary judgment on the issue of breach of promise.

The Bank, on the other hand takes the position, implicitly at least, that the notes place no contractual limitations on it in setting the prime rate. It argues that the term "prime rate" has an established trade meaning, which is "our announced rate," and that this meaning applies regardless of how the term "prime rate" is defined or described in a given note. The Bank further argues that the references in the notes to the most creditworthy customers, etc.,

are meaningless formulaic expressions. Ergo, there is nothing in the loan agreements to indicate that the parties meant to disregard trade meaning, and the notes evidence clear mutual intent to permit the Bank to announce as its prime rate any rate it chose to announce. Alternatively, the Bank argues that the interest rate provisions of the notes are ambiguous and that extrinsic evidence of the parties' intentions is therefore essential to determine their agreement; hence, partial summary judgment for Plaintiffs would be inappropriate.

For the reasons hereinafter set forth, the court rejects Plaintiffs' argument that the Bank had a contractual duty to identify a discrete group of customers as the most creditworthy in order to set its prime rate. It also rejects any contention that charging below-prime rates to certain customers was a *per se* breach of a contractual duty to Plaintiffs. However, the court finds that the Plaintiffs' breach of contract claim might be cognizable on a theory that the Bank breached an obligation of good faith toward Plaintiffs in setting its prime rate. Alternatively, Plaintiffs may proceed on a theory that they are entitled to recoup claimed overpayments of interest.[2]

Although the Bank and the Plaintiffs discuss the two note forms (the promissory note and the real estate note) as if a single problem of contract interpretation were presented, the court finds a fundamental difference in the interest rate language used in the notes. Accordingly, they are considered separately hereinafter.

### A. *Promissory Note*

█ The interest rate terms in the promissory notes state the rate of interest as a certain rate above "the rate charged by [the] bank from time to time to its best Commercial borrowers with respect to ninety (90) day borrowings (the "Prime Rate"). The court finds that this language reflects the parties' intention to define the term

---

**2.** The court is not, of course, holding that either theory is meritorious. The present record is insufficient to make this determination.

"Prime Rate" as "the rate charged by the bank from time to time to its best Commercial borrowers with respect to ninety (90) day borrowings." The factors which lead to this conclusion are (1) the placement of the term "Prime Rate" immediately after the definitional language; (2) the placement of the term Prime Rate in quotation marks within parentheses; (3) the capitalization of the term Prime Rate both within the parentheses and thereafter in the body of the note; and (4) the reasonable specificity of the definitional language.

The definition of the "Prime Rate" in these notes can be divided into three parts for purposes of interpretation: it is a rate (1) charged from time to time (2) to the Bank's best commercial borrowers (3) on 90-day borrowings.

The Bank argues that the definition is but a formula, devoid of content, that carries the same trade meaning as the term prime rate. Were there one formula generally in use to signify a rate of interest announced as such by the Bank, this argument might deserve closer consideration. The Bank has neither asserted nor proved that this is the case. The affidavits of banking officials submitted to the court state that the term, prime rate, however defined or described, means the rate announced as such by a bank. The affidavits do not suggest that there is one formulaic definition of prime rate that itself carries a generally understood trade meaning. More importantly, the affidavits refer to the obverse of the situation before the court. Here, the base rate characteristics are specified, and then the base rate is given the name "Prime Rate." The term "Prime Rate" here is a shorthand reference to the definition; the definition is not a meaningless phrase appended to the term. Hence, acceptance of the Bank's "trade usage" theory would be tantamount to depriving the parties of the right to set contractual terms of their choosing.

Although the definition of the base rate is not meaningless, two of its three parts require construction by the court. O.C.

G.A. § 13–2–1. What is the meaning of the phrases "charged from time to time" and "[the Bank's] best Commercial borrowers"? Plaintiff Kleiner[3] asserts that the Bank was obligated to identify its most creditworthy customers and set a prime rate which equaled the lowest rate charged to any commercial borrower for a 90-day period while his promissory notes were outstanding.

The court finds that "from time to time" is a reference to the fact that the prime rate changes at variable intervals when the Bank desires to change it. "[The Bank's] best Commercial borrowers" must be interpreted in connection with that phrase, and also in light of the unspecified but obvious fact that the prime rate is set to govern future transactions.

One may discern at a glance that the phrase "best Commercial borrowers" is not capable of precise application. Reasonable bankers could disagree about which borrowers are the most creditworthy. However, the court finds that the imprecision inherent in application of the term is irrelevant to its legal interpretation because the prime rate is set to cover an unspecified period of time in the future. This means the parties never intended that the Bank would undertake categorization of its borrowers in order to set its prime rate. It would be a physical impossibility to determine precisely who the most creditworthy customers will be, or indeed exactly who the customers will be, in the future. Further, the parties could not possibly have intended for the Bank to conduct a daily canvass of its commercial customers to ascertain who were the most creditworthy. This would be an administrative nightmare, and an obviously impractical banking practice.

The court finds that the parties intended by the language "the rate charged by the Bank from time to time to its best Commercial borrowers with respect to ninety (90) day borrowings" to establish a standard of reference for setting the prime rate. In

---

**3.** Dr. Kleiner is the only named plaintiff who signed a "promissory note."

this context, "best Commercial borrowers" is by no means devoid of meaning or even ambiguous. Instead, it is a clear reference to the type of customers who get the most favorable interest rates. Thus, "the rate charged by [the] Bank from time to time to its best Commercial borrowers with respect to ninety (90) days borrowings" means the Bank's reasonable estimate of the lowest rate it would be willing to charge commercial customers on 90-day loans for the foreseeable future, *i.e.*, until such time as the Bank decides to reset the prime rate.

Although the court has rejected the theory on which Plaintiffs base their motion for partial summary judgment, it cannot enter summary judgment for the Bank if there is any possible basis in the record on which Plaintiffs may recover.[4] Since there is at least one possible theoretical basis for recovery, and perhaps two, summary judgment for the Bank would be improper.

■■ In the analysis of the promissory note form set forth herein, the court has found that the note defines "prime rate" as the Bank's reasonable estimate of the lowest rate it would be willing to charge commercial customers on 90-day loans for future transactions. However, the parties have not explicitly addressed whether the Bank has any contractual obligation in making the estimates on which the prime rate is set. Arguably, where an agreement permits one party to unilaterally determine the extent of the other's required perform-

ance, an obligation of good faith in making such a determination is implied.[5] If so, then a breach of such obligation would be a breach of an implied promise. In that case, the question whether the prime rate(s) were such good faith estimates in the time periods relevant to notes would be a question of fact to be determined by the jury. O.C.G.A. § 13–2–1.

■ As the parties have recognized, Plaintiffs also may seek to recover on the theory that they overpaid interest which they are entitled to recoup. This theory does not require proof of a contractual breach per se, but does require proof of an overpayment. Plaintiffs must show that the base rate used in computing their interest payments exceeded "Prime Rate" as defined in the notes. The court notes that Georgia law requires a plaintiff in an overpayment case to prove that he was unaware of the true facts at the time the overpayment was made, *Pine Belt Lumber Company v. Morrison & Harvey*, 13 Ga. App. 453, 455, 79 S.E. 363 (1913), or fit within an exception to the "voluntary payment" rule, O.C.G.A. § 13–1–13.

Since under either of the above two theories the jury would have to determine whether the prime rate was a good faith or reasonable estimate of the lowest interest rate the bank expected to offer to commercial customers on 90-day loans during relevant periods, the question arises whether

---

**4.** The Bank has not filed a motion for summary judgment; however, it asks in its brief in opposition to Plaintiffs' motion that judgment be granted in its favor, citing 10A C Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2720 & n. 20 (1983).

**5.** Because the "Prime Rate" was to be set unilaterally by the Bank, the Bank may have had an obligation to estimate in good faith the lowest interest rate it expected to offer on 90-day loans to commercial customers. Under Georgia law, good faith is an element of every contract. O.C.G.A. § 13–4–20 (Michie 1982); *Crooks v. Chapman Co., Inc.*, 124 Ga.App. 718, 719–20, 185 S.E.2d 787 (1971) ("Good faith is, if anything, a minimum standard of conduct in any contract .... Code § 20–1101 [now O.C.G.A. § 13–4–20] ... calls for 'substantial compliance with the spirit, and not the letter only, of the contract' in

its performance. 'Good faith' is merely a shorter way of saying the same thing."). *See* Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance...."). Comment d to this section notes that "evasion of the spirit of the bargain" and "abuse of a power to specify terms" have been judicially recognized as examples of bad faith in the performance of contracts. *See also* 3A A. Corbin, Corbin on Contracts § 654A(A) (Kaufman Supp.1982) ("Good faith in contracting is the obligation to preserve the spirit of the bargain rather than the letter, the adherence to substance rather than form."). The source of the good faith requirement is found, according to Professor Kaufman, either in the statutes or in the common law of the states. *Id.* at § 654A(B).

Dr. Kleiner had promissory notes outstanding during the entire period for which the class has been certified. If not, it may be necessary to adjust the definition of the promissory note class. The court directs the parties to address, by filing briefs within twenty (20) days of date of entry of this order, whether the promissory note class is restricted to those borrowers whose notes were outstanding during the same periods as those of Dr. Kleiner, and if not, why it should not be.

## B. *Real Estate Note*

[8] The real estate notes state the rate of interest as a certain rate "plus the 'prime rate' currently charged from time to time by [the Bank] to its best and most credit worthy customers." Unlike the promissory notes, the real estate notes do not define the base rate. Although the notes describe the "prime rate" as a rate "currently charged from time to time by [the Bank] to its best and most credit worthy customers," this phrase standing alone is better interpreted as referring, not to a required method of generating the "prime rate," but to the expected uses to which the "prime rate" would be put. In the real estate notes, the Bank made no contractual commitments—at least none ascertainable as a matter of law—as to how it would ascertain its base rate.[6]

In the court's view, the parties have not "evidenced what they intended by what they wrote." *Broad v. Rockwell International Corporation*, 642 F.2d 929, 947 (5th Cir.) (Former Fifth Circuit case), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981), *quoting Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 386–87, 292 N.Y.S.2d 878, 239 N.E.2d 628 (1968) (interpreting New York law). Because the real estate notes are silent as to whether the parties intended the "prime rate" to be the rate the Bank announced as such or an estimated lowest commercial rate, what the parties contemplated is a

question of fact for the jury to determine. O.C.G.A. § 13–2–1; *McNaughton v. Stephens*, 8 Ga.App. 545, 548, 70 S.E. 61 (1911).

Presumably, the Bank's intent would have been unchanging from note to note, but the intent of different class members may have varied. Because it seems inevitable that evidence of the parties' intent with respect to each note must be offered, the court is inclined to decertify the real estate note class. The Plaintiffs and the Bank are, therefore, directed to show cause, by filing briefs within twenty days of entry of this order, why the real estate note class should not be decertified. At the same time, the parties shall address these issues: (1) whether the real estate note claims should be tried separately from the promissory note claims and (2) if Plaintiff Morosani seeks to recover on an overpayment theory, whether North Carolina law requires a showing that he was unaware of the relevant facts at the time of the overpayment.

## II. *Per Annum Claims*

Both the promissory notes and the real estate notes provide for interest at x percent "per annum" plus the prime rate. The real estate notes further state that interest will be calculated on a "360-day year simple interest basis."

There is no dispute concerning how interest was actually calculated. The Bank divided the annual interest rate (consisting of the prime rate plus x percent) by 360 to obtain a daily interest rate. If a note were to be outstanding for, say, 90 days the daily rate would be multiplied by 90 in order to obtain the interest applicable. Similarly, if the note were to be outstanding for 365 days the aggregate interest rate would be computed by multiplying the daily rate times 365. Where the note is outstanding for 365 days, the borrower pays $\frac{1}{72}$nd more interest under this so-called 365/360 method than he would were

---

**6.** If the descriptive reference were proven to be false and misleading and if Plaintiff relied on same to his detriment, there might be a basis for

a common law fraud claim; however, Morosani has not asserted such a claim.

the Bank to simply multiply the amount of principal times the annual interest rate. This would make the effective interest rate on an 18% loan, for example, 18.25%.

The Plaintiffs insist that the maximum amount of interest that can be charged in a 365-day period on a note calling for interest at x percent "per annum" is the product of the principal times the annual interest rate. Correlatively, they maintain that for any fraction of a 365-day period, the interest that can be charged is an equivalent fraction of the amount that can be charged for 365 days. Plaintiffs reason that per annum means for a year; a year is 365 days; a per annum interest rate is based on a 365-day period; it yields, for that period, interest in an amount equal to the product of the principal times the annual interest rate. Thus reasoning, Plaintiffs allege that they overpaid interest on their notes which they now seek to recoup.

The bank, on the other hand, contends there was no overpayment. It maintains that the 365/360 method of interest calculation is generally recognized, predominantly used, and customarily accepted in the commercial lending industry. The Bank appears to be asserting that the phrase "per annum" has a trade meaning, O.C.G.A. § 13–2–2(2), or that there is a trade custom relative to interest computation, O.C.G.A. § 13–2–2(3).

In response to Plaintiffs' motion for partial summary judgment, the Bank has filed affidavits of executives of two other Atlanta banks. These affidavits indicate that the 365/360 method of interest calculation is one of several generally recognized, customarily accepted methods of computing interest in the banking industry. The affidavits also recognize that the 360/360 and 365/365 methods are generally recognized and commercially reasonable methods of computing interest.[7]

The contract analysis here begins, of course, with the notes themselves. The promissory note only states that the borrower will pay interest at the rate of x percent plus the prime rate "per annum." The term "per annum" is not otherwise defined in the note, nor has it received relevant judicial interpretation.[8] The court further finds that the affidavits tendered by the bank fail to support any conclusion that the term "per annum" has a trade meaning or that any trade custom applies which would reveal the true meaning of the phrase "per annum." Indeed, the affidavits suggest the absence of a common meaning for the term "per annum," rather than the existence of a common meaning.

Moreover, the method of interest calculation envisioned by the parties is not revealed in the "usual and common signification," O.C.G.A. § 13–2–2(2) (Michie 1982) of the phrase. The dictionary meaning of "per annum" is "in or for each year," Webster's New Collegiate Dictionary (1979); "by the year; annually; yearly," Black's Law Dictionary (5th ed. 1979). Thus, a promise to pay interest "per annum" is simply a promise to pay at an annual interest rate. This does not obligate the lender

---

7. Under the 365/365 method, a lender uses a base year of 365 days and calculates interest on a daily basis. If interest is payable monthly, the amount of interest paid in a given month depends on the number of days in that month. The formula for computing interest on the daily outstanding principal balance is as follows: the specified annual rate divided by 365 [this yields the daily interest rate] times the unpaid principal times the number of days in the payment period.

Under the 360/360 method, a lender uses a base year of 360 days and calculates interest on a monthly basis. He assumes that each month contains 30 days. The amount of interest paid does not change, then, from month to month. The formula for computing monthly interest is: the specified annual rate divided by 12 [this yields the monthly interest rate] times the unpaid principal.

8. In a 1905 case, the Georgia Supreme Court held a lender's calculation of interest on a 365/360 day basis was not usurious, even though such calculation yielded interest above the usury ceiling, where "this principle is resorted to in good faith as furnishing an easy and practicable mode of computation, and not as a cover for usury." *Patton v. Bank of LaFayette*, 124 Ga. 965, 968, 53 S.E. 664 (1905). This holding has no relevance to contract analysis in the instant case; the issue here is the parties' intent, not usury limits.

to use any particular method of interest computation. Nor does it restrict the amount of interest that can be charged to the amount that accrues when interest is calculated daily for 365 days. Although "[w]hen the period of a 'year' is named [in a contract], a calendar year is generally intended, ... the subject-matter or context ... in which the term is found or to which it relates may alter its meaning." Black's Law Dictionary (5th ed. 1979) (definition of "year"). *See Patton*, 124 Ga. at 970, 53 S.E. 664 (it is allowable to take interest for 90 days computed on the principle that a year consists of 360 days).

■ In summary, neither the content of the promissory note itself nor the evidence before the court at this time clearly reveals what the parties intended by the term "per annum."

■ The "per annum" claims based on the real estate notes require a slightly different analysis. The real estate notes recite the customer's obligation to pay interest "per annum," but they further state that interest will be paid on a "360-day year simple interest basis." The Bank claims that the reference to 360 days clearly evidences the parties' intent to figure the daily interest rate based on a 360-day year, just as it did. Plaintiffs argue that the phrase "360-day simple interest basis" means that the parties intended to use a 360/360 method in calculating interest, not a 365/360 method. Contrary to the arguments of the parties, the court does not find that the phrase carries a plain meaning. For one thing, neither side has addressed whether or not the phrase "simple interest basis" is meaningful in relation to their respective theories.

■ There is also another reason for denying Plaintiffs' motion for partial summary judgment as to the "per annum" claims arising from both the promissory note and the real estate note. These claims clearly are not breach of contract claims; they are claims premised upon Plaintiffs' claimed overperformance on promises they made to the Bank. Thus, the "voluntary overpayment" doctrine, *see* O.C.G.A. § 13-1-13, is squarely applicable. It is Plaintiffs' burden to show the court that at the time they made their interest payments, they had no notice of the fact that they were making payments at a rate exceeding the stated annual rate (*i.e.*, the prime rate plus x percent). In light of the record's numerous references to periodic interest statements sent to Plaintiffs, a finding of overpayment of interest could turn out to be theoretical only.

III. *Summary*

In summary, Plaintiffs' motion for partial summary judgment is DENIED. The parties shall file briefs within twenty (20) days of date of entry of this order addressing the matters set forth above.