Robert J. **SHELDON** and Joan M. Sheldon, doing business as World Bazaar of Southlake, Plaintiffs–Appellees,

v.

**MUNFORD, INCORPORATED,**
a Georgia Corporation,
Defendant–Appellant.

No. 89–2324.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1991.

Decided Dec. 5, 1991.

Robert D. Brown, Spangler, Jennings & Dougherty, Merrillville, Ind., argued, for plaintiff-appellee Robert J. Sheldon.

Robert D. Hawk, Robert D. Brown, Spangler, Jennings & Dougherty, Merrillville, Ind., for plaintiff-appellee Joan M. Sheldon, dba World Bazaar of Southlake.

Marc P. Seidler, Stephen W. Schwab, John F. Verhey, argued, Rudnick & Wolfe, Chicago, Ill., Daniel W. Glavin, Beckman, Kelly & Smith, Hammond, Ind., Dennis S. Meir, Elizabeth D. Floyd, Kilpatrick & Cody, Atlanta, Ga., for defendant-appellant Munford, Inc.

Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Defendant Munford, Incorporated appealed from a judgment for $300,000 for unlawful termination of its Franchise Agreement with plaintiffs.[1]

## FACTS

Munford, a Georgia corporation with its principal place of business in Georgia, owned and operated the World Bazaar franchise system. In 1974, the Sheldons, residents of Indiana, entered into a Franchise Agreement with Munford. The Sheldons started operating their World Bazaar store in the Southlake Mall in northwest Indiana in November, 1974.

The Franchise Agreement contained an exclusive territory provision which prohibited Munford from operating a World Bazaar business or similar operation within seven miles of the Sheldons' store. In 1982, a LeeWards store opened in the Southlake Mall, but at that time, the Sheldons did not regard it as significant competition. World Bazaar stores sold domestic and imported home decorative items and LeeWards was primarily a craft store. However, in August, 1985, Munford purchased the LeeWards chain of stores, and the LeeWards store in Southlake Mall started carrying merchandise which was obtained through Munford and which was in direct competition with merchandise sold by the Sheldons.

The Sheldons complained to Munford, and in April, 1986, the president and the corporate counsel of Munford met with the Sheldons to attempt to resolve the problem. Nothing was resolved. On April 28, 1985, the Sheldons received a default notice because their accounts with Munford were past due. The Franchise Agreement required the Sheldons to pay a service fee based on their sales every week and to pay for goods received from Munford thirty days after the date of invoice. The Sheldons were behind on both payments, as they had been for the entire time they had operated the franchise. The Franchise Agreement allowed Munford to terminate the franchise for failure by the Sheldons to adhere to any provision of the agreement and to cure the failure within seven days after notice by Munford. Munford, however, decided not to terminate the franchise at this time.

In July, 1986, the Sheldons and Munford entered into a Reconciliation Agreement. This agreement provided that LeeWards would discontinue selling certain items in competition with World Bazaar and that LeeWards would obtain approval from the Sheldons before adding new items to its inventory. Separately, the parties also agreed that the Sheldons would bring their account current, but Munford claims it was to be current by October 1, 1986, while the Sheldons claim it was to be current by the end of March, 1987.

The Sheldons believed that LeeWards sold items in violation of the Reconciliation Agreement, and the Sheldons continued to complain to Munford. The Sheldons filed a suit against Munford and LeeWards for breach of the Reconciliation Agreement, as

---

1. Jurisdiction is founded on diversity. The parties have treated most issues as governed by Georgia law because of a choice of law provision in their agreement.

well as the Franchise Agreement, on December 5, 1986.

On December 19, 1986, Munford again sent the Sheldons a notice of default. The Sheldons were $8,200 in arrears, which was considerably less than the amount due when the Reconciliation Agreement was signed. The notice said Munford would terminate the franchise seven days after the Sheldons received the notice unless the Sheldons cured the default before that time. On December 30, 1986, Munford terminated the franchise. Munford offered to rescind the termination on January 7, 1987, but the Sheldons, having already wound down the affairs of the franchise, rejected the offer.

The Sheldons amended the complaint they had filed on December 5, 1986, to include a claim that Munford, having granted plaintiffs an extension to March 31, 1987, wrongfully terminated the Franchise Agreement. The parties consented to proceeding before a Magistrate Judge. The case went to trial before a jury on the claims of wrongful termination and breach of the Reconciliation Agreement. The Magistrate Judge entered a directed verdict on the claim of competition in breach of the Reconciliation Agreement and Franchise Agreement at the close of the Sheldons' case because, although there was evidence from which the jury could find breach, there was no evidence that allowed damages to be determined with the necessary specificity.

Defendant Munford relies upon provisions of the contract requiring the Sheldons to make payments at specified intervals and the provision permitting Munford to terminate the contract after giving notice of default and seven days in which to cure the default. It was undisputed that throughout almost all the twelve years under the contract the Sheldons were in default in varying amounts, but paying interest on over-due amounts, and Munford permitted this situation to continue without terminating the contract. The Sheldons claimed that by this course of conduct, Munford waived strict compliance. They also claim that in 1986, Munford had ex-

pressly allowed them until the end of the first quarter of 1987 in which to bring their account current, thus modifying the contract and waiving the right to terminate for non-payment prior to this time. The Sheldons had substantially reduced their past-due obligation by December, 1986, and contend that Munford's reliance upon the default in December was pretextual, and an attempt to terminate on account of the Sheldons' bringing a lawsuit on their claim that Munford was competing with them in breach of their agreements.

The jury reached a verdict in favor of the Sheldons for $300,000, and judgment was entered accordingly. On appeal, Munford raises several challenges.

## I. INSTRUCTION CONCERNING CAUSE

The Franchise Agreement gave Munford the right to terminate "in the event that Franchisee fails to adhere to any provision of this Agreement and to cure such failure within seven (7) days after notice of such failure is delivered to Franchisee." The agreement also provided that "in order to effect uniform interpretation of all Munford Standard Franchise Agreements, it shall be governed and construed under and in accordance with the laws of the State of Georgia."

■ Under Georgia law, good faith is an element of every contract. *Kleiner v. First Nat'l Bank of Atlanta*, 581 F.Supp. 955, 960, n. 5 (N.D.Ga.1984). A party cannot assign, pretextually, a contractual ground for termination, where the real reason is something different. *A Cut Above Sandwiches, Inc. v. Equitable Life Assurance Society of the United States*, 160 Ga.App. 512, 287 S.E.2d 241, 242 (1981); *Davis v. Sears, Roebuck and Co.*, 873 F.2d 888, 894 (6th Cir.1989) (applying Georgia law).

■ Munford challenges the following instruction:

Plaintiffs allege that the defendant breached the franchise agreement when it terminated the plaintiffs' franchise. The agreement provides that the fran-

chise may be terminated only for "cause," a provision that protects plaintiffs from an arbitrary or capricious termination of the agreement. Munford claims that it had "cause" for terminating the franchise agreement.

In determining whether the plaintiffs committed a material breach of their duties under the franchise agreement, thus giving Munford "cause" for terminating the agreement, you must determine whether a reasonably prudent company, acting prudently, fairly, and in good faith, would have been prompted to terminate the franchise agreement for the reasons that Munford gave. In other words, did Munford act as a reasonably prudent company would have acted under the same circumstances or similar circumstances when it terminated the plaintiffs' franchise?

At trial, Munford objected, saying it was not required to have a reason for termination which satisfied the equitable notions set forth in this instruction but only must establish that they terminated it for that cause which was specified in the contract, which, in this case, was that the Sheldons had violated a term of the Franchise Agreement—and failed to cure that within the specified time period.

We agree that the instruction went outside the literal terms of the agreement. The agreement was not terminable at will, but it did not provide, as the instruction says, that the agreement was terminable for "cause," however that might be defined. Instead, the agreement defined the ground, or cause, for termination as an uncured breach. Georgia law required that termination be in good faith, but the instruction imposed an objective standard of reasonableness. Insofar as it required more of Munford than subjective good faith reliance on an uncured breach, it was erroneous.

■ We note that Indiana has a statute protecting Indiana franchises which declares unlawful any provision in a Franchise Agreement with a resident of Indiana which permits the franchise to be terminated "without good cause or in bad faith."

"Good cause" is defined as including "any material violation of the franchise agreement." *See Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 136–37 (7th Cir.1990); Ind.Code § 23–2–2.7–1(7). The contractual choice of Georgia law could not supervene Indiana's franchise statute, 908 F.2d at 132 (except, possibly, that the agreement in this case was formed before enactment of the statute in 1976). In any event, we do not think the objective standard of reasonableness in the instruction would be supported by the terms of the statute, which differ from the agreement only in requiring that a violation of the agreement be "material," and that termination not be in bad faith.

■ In the light of the facts of this case, however, and the positions urged by the parties, we do not deem the error in this instruction to have been prejudicial to Munford. The jury was instructed on the plaintiffs' theories that the agreement had been modified so that the Sheldons need be current only by March 31, 1987, or that Munford had waived strict compliance. The error in the instruction could have hurt Munford only if the jury had found there was no agreement to extend the time for payment and/or no waiver of compliance, so that there was a material breach, but nevertheless decided that a reasonably prudent company would not have terminated the agreement. We consider this basis of decision most unlikely under the evidence.

## II. FAILURE TO INSTRUCT CONCERNING PROOF OF WAIVER

■ The court instructed generally on plaintiffs' burden to prove their claims by a preponderance of the evidence and explained what that meant. Munford objected to the court's refusal to give its requested instruction that the jury "may not find that Munford waived its rights under the Franchise Agreement unless the evidence is so clear that Munford intended to relinquish its right to terminate that there is no other reasonable explanation."

Munford relies on statements in several Georgia decisions that "the evidence relied

upon to prove a waiver must be so clearly indicative of an intent to relinquish a then known particular right or benefit as to exclude any other reasonable explanation." *Citizens & Southern Nat'l Bank v. Yeager Enterprises, Inc.*, 156 Ga.App. 341, 274 S.E.2d 730, 732 (1980), *rev'd on other grounds*, 247 Ga. 797, 279 S.E.2d 674 (1981); *D.I. Corbett Electric, Inc. v. Venture Const. Co.*, 140 Ga.App. 586, 231 S.E.2d 536, 538 (1976). As put in some older cases,

> Acquiescence may sometimes amount to waiver, because a legal intention may in some cases be presumed from conduct, but there is always the requisite of intent, either express or implied; and when the only proof of that intention rests in what a party does or forbears to do, his acts or omissions to act relied on should be so manifestly consistent with and indicative of an intention to voluntarily relinquish a then known particular right or benefit, that no other reasonable explanation of his conduct is possible.

*Monroe Motor Express v. Jackson*, 74 Ga. App. 148, 38 S.E.2d 863, 869 (1946); *Stapleton v. Dismukes*, 43 Ga.App. 611, 159 S.E. 768, 772 (1931); *Plumer v. Continental Casualty Co.*, 12 Ga.App. 594, 77 S.E. 917, 920 (1916).

The Sheldons relied not only on a course of dealing in which Munford consistently allowed Sheldons' obligations to remain unpaid in varying amounts, but also on express promises that they would have until the end of the first quarter of 1987 to bring their accounts current.

■ The length of the extension was disputed, but that issue would be resolved according to the jury's view of the preponderance of the evidence. The Georgia rule above cited does not apply to proof of express waiver.

In any event, a Georgia statute on which the jury was instructed clearly fits Munford's tolerance of late payment by the Sheldons over a period of eleven years:

> Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement. The contract will be suspended by the departure until such notice.

O.C.G. 13–4–4 (1982).

### III. MITIGATION OF DAMAGES

■ The jury was instructed on the Sheldons' duty to mitigate damages,

> that is, to take advantage of any reasonable opportunity he may have had under the circumstances to reduce or minimize the loss. However, the defendant has the burden to prove by a preponderance of the evidence that the plaintiffs have failed to use reasonable diligence to mitigate the damages.

The jury evidently decided that defendant had not met its burden.

Munford takes no exception to the instruction as a correct statement of Georgia law. Munford argues, however, that the record establishes failure to mitigate damages as a matter of law.

Munford's concept of mitigation is somewhat peculiar in that it would require the Sheldons to pay Munford money which the jury found was not yet due. It argues that because the Sheldons had funds and marketable assets on hand in December, 1986, with which they could have paid the amount which Munford claimed was in default, the Sheldons had the means to retain their franchise and avoid the loss of the opportunity to earn the profits now claimed as damages. We think the jury could properly decide that it was not reasonable to require the Sheldons to pay Munford in December money which the Sheldons claimed and the jury presumably decided was not yet due until the following March. It would be strange if the doctrine of mitigation of damages required a party to honor his adversary's bad faith and premature declaration of default.

### IV. THE DAMAGE AWARD

■ Munford argues that the evidence of lost profits is so speculative and conjec-

tural that it will not support any award, and, alternatively, that the award of $300,000 is excessive.

The choice of law provision in the Franchise Agreement says that the agreement "shall be governed and construed under and in accordance with" Georgia law. There may be a question, not argued by the parties, whether this language means that if there is a breach, the parties intend that Georgia law on damages will apply. This court has indicated that there is a question in Indiana, the forum state, whether remedial issues should be decided according to the same law that governs substantive issues. *Patton v. Mid–Continent Systems, Inc.,* 841 F.2d 742, 750 (7th Cir.1988). In *Patton,* the contractual provision seems to have read a little more broadly, "Arkansas law shall govern all questions arising out of the contract." *Id.* at 749. In any event, the Sheldons do not specifically take exception to Munford's reliance on Georgia law, although they cite cases from other jurisdictions as well.

Georgia cases have stated a general rule "that the expected profits of a commercial venture 'are not recoverable as they are too speculative, remote, and uncertain.'" *Molly Pitcher Canning Co. v. Cent. of Ga. Ry. Co.,* 149 Ga.App. 5, 253 S.E.2d 392, 396 (1979). Yet, it appears that the concern relates more to uncertainty as to cause than uncertainty as to amount and that "[w]here ... *in an established business with clearly defined business experience as to profit and loss ...* [anticipated profits] may, if clearly and fairly shown, be considered in estimating the extent of the injury done." *Id.* 253 S.E.2d at 397, emphasis supplied in *Molly Pitcher.*

The Sheldons (Mrs. Sheldon principally) operated the store through a corporation. Its tax returns were for fiscal years ending January 31. We shall refer to each fiscal year as if it were the calendar year in which eleven months fell. Gross receipts and net income or loss for each year were as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1975: | $295,250, | ($7,066); | 1976: | $375,099, | $33,554; |
| 1977: | $471,961, | $13,724; | 1978: | $508,808, | $65,491; |
| 1979: | $474,613, | $6,848; | 1980: | Tax return not located; | |
| 1981: | $392,689, | $13,600; | 1982: | $422,530, | ($2,533); |
| 1983: | $456,309, | $15,518; | 1984: | $469,142, | ($27,064); |
| 1985: | $427,665, | $(6,182); | 1986: | $396,244, | ($42,160); |

Ms. Sheldon drew a salary ranging from $10,400 to $29,500 ($39,544 in the year of termination).

The Sheldons' expert, Professor Nevin, testified that he had studied the performance of the store for ten years, excluding the year of termination and the year for which he had no figures, and had reached an opinion as to the present value of the income the Sheldons would have derived over ten years if the franchise had not been terminated. He computed this at $475,887, and considered it the economic damage from the loss of the franchise. He assigned no value to the possibility they could have continued in business beyond ten years nor to the possibility they might have sold it after ten years. He had added the compensation drawn by the Sheldons to the corporate income or loss, and averaged the total over the past ten years, making adjustments for inflation and discounting to determine present value.

Munford's expert, Professor Bernard, made an analysis which produced $32,294.28 as the present value of lost income over the ten years following terminations. The most significant differences between him and Professor Nevin were two: (1) he considered only income or loss to the corporation, treating the compensation drawn by the Sheldons (principally Mrs. Sheldon) as an expense of producing the income; (2) he computed a weighted average over the past ten years, giving increasing weight to the years as they approached the time of computation, so that more current experience

had greater weight in the prediction of the future.

Assuming that Mrs. Sheldon's salary was reasonable for the services she performed as manager, there is logic in Munford's argument that it was a necessary expense to the corporation. *See Advantage Tel. Dir. Consult. v. GTE Directories*, 849 F.2d 1336, 1351–53 (11th Cir.1987) (applying Florida law). The jury, however, seems to have solved the problem in Munford's favor. The evidence showed that Mrs. Sheldon was qualified as a nurse, had worked parttime as such while managing the store, and returned to the profession after termination. There was evidence of what she could earn. The present value of her expected full-time earnings over ten years, with adjustment for probable inflation, was $186,000, not greatly in excess of the $175,-887 by which the jury reduced Professor Nevin's figure. The jury may have thought of that in terms of mitigation, but as those earnings are roughly comparable to the compensation reflected in Professor Nevin's analysis, the jury's reduction offset his inclusion of compensation.

We reject Munford's argument that there was no evidence to support any award of damages. Its own expert computed a loss of $32,000.

■ Once the district court has found a sufficient foundation for an expert's testimony, it properly leaves questions concerning his methodology, findings, and expertise to cross-examination. The accuracy of such testimony is a matter of weight and not admissibility. *Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788, 797 (7th Cir.1989).

■ We are, however, concerned by the lack of a satisfactory treatment of an unescapable adverse factor which the Sheldons would have had to face two years into the next ten, if there had been no termination. The store was seemingly in a good location. Their fourteen-year lease would expire at the close of 1988. Their rent had been $6.50 per square foot, or about $27,000 per year. The landlord was insisting on $15.00 per square foot in a new lease. Mrs. Sheldon testified that she could not have af-

forded to renew the lease at that rate, given the sales volume she enjoyed. As alternatives, she suggested only that she might cut her store in half or move to some other smaller space. There was no testimony as to the feasibility of either alternative, and only an intimation that the operation could fit into a smaller or different space and maintain its sales. Professor Nevin testified on cross-examination that he considered it impossible to evaluate the alternatives Mrs. Sheldon mentioned, and he had not considered the effect of the increased rent on the business if she retained the same space. Professor Bernard testified that his estimate was based on an assumption that there would be no extraordinary operational expenses, and renting the same space at $15.00 per square foot would destroy that assumption.

The failure to address the effect of the rent problem is at least dissimilar to the faults found in the computation of compensatory damages in *Patton v. Mid–Continent Systems, Inc.*, 841 F.2d 742, 748 (7th Cir.1988). The problem, however, is a fact of life, certain to arise, and means that there is a high probability that there would have been no opportunity for profit after two years. Accordingly, we conclude that the award of $300,000 cannot be sustained, and defendant is entitled to a new trial unless plaintiffs accept a remittitur.

## V. CLOSING ARGUMENT

Munford argues that the district court should have granted its motion for a new trial because the Sheldons' counsel made inflammatory statements in his closing argument. Munford points to statements about Munford's wealth and statements which attempt to discredit Munford's counsel.

■ Although a lawyer should neither disparage opposing counsel nor seek sympathy for his client by pointing to the wealth of his opponent, "improper comments during closing argument rarely rise to the level of reversible error." *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1311 (7th Cir.1985). Also, we give defer-

ence to the decision of the Magistrate Judge not to intervene in the absence of objection, nor to grant a new trial because he heard the statements and was in a far better position than we are to judge the effect of improper comments on the jury. *Canada Dry Corp. v. Nehi Beverage Co.,* 723 F.2d 512, 525 (7th Cir.1983).

■ Early in the argument-in-chief of Mr. Hawk, one of the Sheldons' counsel, he referred to the comparative wealth of the Sheldons and Munford, and to Munford's counsel as having been intent on "trying to smear" the Sheldons. Munford's counsel's objection was sustained. That was the only objection to any relevant part of Mr. Hawk's argument, now complained of. Three references to Munford's big revenue occurred during the rest of Mr. Hawk's argument-in-chief. A further reference to Munford's wealth and attacks on the argument of Munford's counsel occurred during rebuttal, but Munford's counsel did not object.

Mr. Hawk's tactics do not merit approval and were unprofessional, but in the absence of objection, we are not persuaded that they require reversal. *Gonzalez v. Volvo of America Corp.,* 752 F.2d 295, 298 (7th Cir.1985) (repeated references to comparative wealth of parties and implication of criminal conduct of defendant's officers not fundamental error and not grounds for reversal in the absence of objection).

The judgment appealed from is REVERSED and cause REMANDED for a new trial unless within ten (10) days after receipt of our mandate in the district court, plaintiffs file written election to take judgment for $100,-000. In the event of such election, judgment shall again be entered for that amount. Interest shall run from the date of the original judgment.

REVERSED and REMANDED.