**HAROCO, INC., et al., Plaintiffs,**

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, et al., Defendants.**

**No. 83 C 1618.**

United States District Court, N.D. Illinois, E.D.

April 20, 1992.

Ronald L. Futterman, Aram A. Hartunian, Robert C. Howard, James Gerard Bradtke, Phyllis L. Crocker, Robert Mandel Weissbourd, Steven P. Schneck, Futterman & Howard, Chtd., Chicago, Ill., for plaintiffs.

Don H. Reuben, Winston & Strawn, Michael White Coffield, Kevin Michael Flynn, Alton B. Harris, Coffield, Ungaretti and Harris, Katherine E. Rakowsky, David E. Schoenfeld, Grippo & Elden, James John Stamos, Stamos & Truco, Chicago, Ill., for defendants.

### MEMORANDUM AND ORDER

MORAN, Chief Judge.

Back in 1987 this court granted defendants' motion for summary judgment. Their argument then was that only an insignificant number of American National Bank and Trust Company of Chicago

(ANB) 90–day unsecured commercial loans were made at rates less than ANB's declared prime rate. Defendants relied upon an analysis of 579 loans of $500,000 or more, only eight of which were made at a rate lower than the announced prime rate. Of those eight loans, four of the discrepancies related to the timing of prime rate changes, three were due to clerical errors, and the other was a LIBOR loan, a different kind of animal. Defendants' analysis depended, however, on the exclusion of loans without prepayment privileges. In 1987 we vacated in part the summary judgment because plaintiffs undermined that analysis by disputing the exclusion of loans without prepayment privileges.

Extensive discovery followed, and defendants now move to "reinstate" the summary judgment. We are not at all sure that we should "reinstate" summary judgment but we are persuaded that defendants are now entitled to summary judgment, and we enter summary judgment for the defendants and against the plaintiffs.

Federal jurisdiction depends upon plaintiffs' RICO claims, but the evidence just does not support fraud claims. The present motion is, in one sense, a rerun of the earlier motion as it analyzes a number of loans that plaintiffs claim are below the announced prime rate. It emphasizes, however, the somewhat subjective meaning of a prime rate and the necessity for plaintiffs to produce some evidence of a fraudulent scheme.

It is beyond dispute that, during the relevant period, ANB from time to time changed its announced prime rate and those changes followed the lead of other and larger banks. Plaintiffs insist, however, that ANB's real prime rate was lower than the announced prime rate and that the announced prime rate was a device to inflate the basis for calculating the interest on over prime loans. They do not present any evidence that anyone at ANB ever told lending officers to ignore the announced prime rate in loans to the better customers. Plaintiffs' argument is, essentially, that the prime rate is the rate actually charged to the largest and most creditworthy borrowers; that any bank will extend its best rates to its best customers; and that the prime rate is therefore the lowest rate given to any borrower at the time, since that borrower must necessarily have been the largest and most creditworthy customer.

That approach is contrary to the concept of "prime rate" enunciated by the Seventh Circuit in *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 682 (7th Cir.1987), approving the approach taken in *Kleiner v. First Nat'l*, 581 F.Supp. 955 (N.D.Ga.1984):

> As *Kleiner* notes, a prime rate is merely a bank's forecast of what it would charge its most creditworthy corporate customers for a 90–day unsecured loan. It is not an actual transaction price, because the computation of such a price—requiring, as it would, averaging interest rates across numerous loans made at different times on different terms (e.g., compensating balances)—would be infeasible. See *id.* at 958–960. Reasonable pretrial discovery ... brought to light no evidence that the forecasts that Continental used in deciding how much interest to charge members of the class were not·good-faith estimates of what Continental would charge its most creditworthy customers for a 90–day unsecured loan.

Plaintiffs insist that the *Mars* formulation is *dicta* and that a prime rate has to be what was charged, not some amorphous estimate or forecast of some future rate. And, indeed, a bank could set up some computer model of better customers and then average the interest rates on loans to those customers as an approximation of the prime rate during a concluded period of time. That rate would not necessarily be the lowest rate charged some customer, ANB had no such computer model, and (as the ongoing controversies here over what loans should be considered in reviewing ANB's practices will illustrate) any such model could be subject to considerable variations.

In any event, that was not how the prime rate was determined. The ANB prime rate was an estimate, but only in a limited

sense. The ANB prime rate was the announced prime rate. When ANB announced a change in the rate there had been no transactions at that rate. It was saying to the market, "This is what we expect to charge our best customers, by and large, for the following period, and until we announce a subsequent change."

Such a representation would be a fraud if there was intention to charge less and the announced rate was inflated so as to permit overcharging "prime-plus" borrowers. Plaintiffs do not come up with any evidence of the bank telling its lending officers that the announced prime rate was more than the real prime rate, that the announced rate was to inflate "prime-plus" interest charges, and that they should consider a lower rate as the true prime rate in negotiating loans to the best customers. They rely, instead, upon inferences they contend can be made on the basis of 73 targeted loans during the relevant period.

The 73 loans are those selected by plaintiffs as loans at below the announced prime rate during the relevant time period. There were, during that same period, 6,921 90–day unsecured commercial loans. Plaintiffs have designated as suspect only 1.03% of those loans. They claim that ratio is meaningless because that universe includes all 90–day unsecured commercial loans, not just loans of that nature to the largest, most creditworthy borrowers. There is, indeed, some aspect of comparing apples to oranges if the 73 loans were all to commercial borrowers who reasonably would have to be identified as among the largest and most creditworthy. An analysis of those 73 loans is, therefore, of some interest.

One cannot, of course, specify the largest and most creditworthy customers solely by viewing the size of the loans, although "largest" appears to pertain more to a borrower's volume of business with ANB rather than to its size. Perhaps a company is creditworthy because it seldom needs to borrow much for very long. There is no agreement as to what is a large loan, with $1,000,000 and $500,000 both being advanced as benchmarks. It is of note, however, that 17 of the 73 loans are for less

than $100,000 and 57 are for less than $500,000. (One loan, Loan 39, is not listed in defendants' appendix D, but is referenced at their appendix I–16, according to the list on p. 16 of defendants' brief. But that is Loan 40 on the appendix D list. The referencing in the appendices seems to become one number off at Loan 39, with the missing loan apparently one to West Wrightwood Venture.) It is highly improbable that a $35,000 loan is a loan to one of ANB's largest commercial borrowers and, indeed, plaintiffs do not point to anything that would so indicate. We are, therefore, faced with determining what kind of "apples" the designated loans may be, a task similar to that faced by the courts in *Continental Illinois Nat'l Bank and Trust Co. v. Cornelius*, No. C–84–4492 R.F.P. slip op. (N.D.Cal. June 26, 1987), and *Barksdale v. Continental Illinois Nat'l Bank and Trust Co.*, 1989 WL 42625, 1989 LEXIS 4211 (D.Colo.1989).

Defendants claim that 20 of the loans are not commercial loans at all but are, rather, loans to individuals for personal purposes, such as personal expenses, residences, investments, and the like. Plaintiffs respond by pointing out that some are indicated on the forms as commercial loans, that the documentation of some as being for personal purposes is somewhat weak, and that loans to individuals for real estate can be considered as commercial loans. Thus, they argue, those loans can be considered as evidence of defendants' fraud.

Those loans illustrate the vulnerability of plaintiffs' claims. The borrowers could not prevail in *Kleiner, Cornelius* and *Barksdale*, even though the primary issue in each of those cases was the meaning and performance of a contract obligation. Here the plaintiffs must present enough evidence of a fraudulent scheme to get to a jury, if any of their claims are to survive this motion. They have singled out some loans as being at less than announced prime. Defendants have advanced reasons why those loans do not fit the pattern of 90–day commercial loans to their largest and most creditworthy customers. To borrow from employment discrimination law, plaintiffs seem to urge those loans as pro-

viding a *prima facie* case, and defendants have presented plausible legitimate reasons why those loans should not be considered and plaintiffs now claim pretext—but without any substantial evidence that the reasons are pretextual. None of these 20 loans is for more than $200,000 and half of them are for less than $100,000. All are to individuals. None appears to be for carrying on some ongoing business enterprise. It is impossible to tease out of those circumstances any support for the notion that those loans evidence the fraudulent scheme plaintiffs claim.

Defendants contend that 26 of the 73 loans were at rates below prime due to clerical errors or delays between the preparation of a note and its inception date, with an intervening rate change. The evidence they present offers varying explanations. Interest rates were volatile during the relevant period. In some instances a change in the announced prime was on the same day as the loan, and the bank honored the lower rate, usually a matter of a quarter of one per cent. In other instances notes were sent out to borrowers at the then prime, and the notes were not executed until after a change in the announced prime. The bank honored the rate on the note as executed. In some instances the loan documentation indicates that the rate was supposed to be at or above prime, but the actual amount charged was, in error, less than prime. In some instances, according to defendants' affidavits, a lower rate was encoded due to clerical error. For one loan, to West Wrightwood Venture (which is, apparently, the loan missing from defendants' appendix D), defendants cannot locate the loan file. Plaintiffs dispute that the evidence presented establishes or even, on occasion, necessarily supports the stated explanations. In some instances, however, that evidence is conclusive, particularly with respect to errors in charging the agreed rate. More to the point, plaintiffs have provided no basis for asserting that defendants' explanations are unworthy of belief and are a coverup for a pervasive scheme to defraud.

Another group are the participation loans, seven in all. That is, ANB participated in a loan made by another bank at the interest rate agreed between that bank and the borrower. Plaintiffs contend that ANB could choose to participate or not to participate in such loans but, if it did so, then ANB's prime rate was the lowest of any of the rates charged by any of the originating banks during the period of the loan—and announcing a prime rate higher than that other bank's rate was a fraud. We disagree.

Defendants contend that nine of the loans were secured, and they present evidence so indicating. Again, plaintiffs attack the sufficiency of that evidence, but that is not enough. Perhaps in one or two instances the security was more apparent than real, or was delayed by several months. But plaintiffs do not present any basis for believing that defendants were knowingly treating these loans as secured loans to orchestrate a fraudulent prime rate scheme.

One designated loan, No. 63 to Fisher Printing, appears to be less than a 90–day loan. It is unclear whether or not the loan to the Chicago White Sox was at or below announced prime. The other loans are LIBOR loans, and those loans give plaintiffs their best argument. Perhaps because of that defendants offer a variety of reasons why those 15 loans do not support plaintiffs' claim. We have already agreed with some of those reasons. Six of them were participations and one of those was secured. Defendants contend that one was not a commercial loan at all because it was an interbank placement, one was supposed to be partially secured, four involved Dutch guilders, and some were long term credit arrangements with interest charged in 90–day increments but with required rollovers.

To fund a LIBOR loan, ANB borrowed Eurodollars at a fixed rate for a fixed term. It then lent those dollars to its customers for a fixed rate, at the same fixed term, with a penalty for prepayment. The fixed rate charged by ANB included a spread over the fixed rate ANB paid for the Eurodollars. Viewed from the perspective of the evidence most favorable to the plaintiffs, those loans were made to some of

ANB's largest and most creditworthy customers, for varying periods from 30 to 180 days, or even up to a year, but with 90 days very much an option. The fixed rate might well have been attractive to some, even though a drop in the prime could result in interest payments greater than those on a loan at prime (and apparently that did occur in one instance). Others might have speculated that the prime rate would increase. Generally, though, the evidence indicates that the interest rate on LIBOR loans was less than the announced prime and ANB made the LIBOR loan option available to some of its best customers in order to meet competition from other banks.

ANB's main contention is that these were fixed rate loans without the privilege of prepayment and were therefore not really 90-day unsecured commercial loans. It derives some comfort from *Mars, supra* at p. 679, and *Barksdale* (although not much because the matter was not discussed), and the evaluation of a fixed rate loan with no prepayment privilege, as contrasted to a loan tied to prime and with a prepayment privilege, involves differing economic considerations. Still, plaintiffs' evidence is that such loans fall within the universe of the prime rate definition and defendants can point to no clear policy differentiation.

Plaintiffs' evidence does suggest that "some animals are more equal than others," but in very limited circumstances. LIBOR loans were peculiar financial arrangements. When a particularly sophisticated borrower wanted a large loan for a fixed period, ANB might provide a LIBOR option. It obtained Eurodollars through London or its Cayman Islands branch at a fixed rate for the same period, and then lent those matched funds at a predetermined spread, with the borrower obligated to maintain the loan for the same period ANB was obligated to hold the Eurodollars (ANB might sometimes also obtain Eurodollars in anticipation of LIBOR loans).

As the very small number of 90-day LIBOR loans below announced prime indicate, plaintiffs' evidence does not provide support for the notion that defendants channeled its lending to their best customers through alternate loan mechanisms so as to avoid its purported rate structure based on an announced prime rate. ANB bent a little on occasion but, after massive discovery, it is beyond reasonable dispute that the evidence does not establish the fraudulent scheme claimed. It does establish that ANB by and large expected its borrowers: good, bad and indifferent, to pay interest at no less than the announced prime rate, and that the bank, with rare exception, used its announced prime rate as the basis for its lending policies.

We grant summary judgment for the defendants.