POLAR INTERNATIONAL BROKERAGE CORP., suing individually, and on behalf of all shareholders of Willis Corroon Group, PLC, similarly situated, Plaintiff,

v.

John REEVE, Thomas Colraine, Brian D. Johnson, George F. Nixon, Kenneth H. Pinkston, Michael R. Rendle, Joseph M. Rodgers, William A. Schreyer, Allen Sykes, Raymond G. Viault, Patrick Lucas, Willis Corroon Group, plc, Trinity Acquisition, plc, Kohlberg Kravis Roberts & Co., L.P., Guardian Royal Exchange, Royal & Sunalliance, the Chubb Corporation, the Hartford Financial Services Group, Inc., Travelers Property Casualty Corp., Warburg Dillon Read, Inc., Chase Manhattan Bank, Hsbc Investment Bank, Defendants.

No. 98 CIV. 6915(SAS).

United States District Court, S.D. New York.

May 17, 1999.

Samuel P. Sporn, Jay P. Saltzman, New York City, for Plaintiff.

Paul C. Curnin, Simpson, Thatcher & Bartlett, New York City, for Trinity Acquisi-

tion, plc, Kohlberg Kravis Roberts & Co., L.P., Warburg Dillon Read, Inc., Chase Manhattan Bank and Hsbc Investment Bank.

Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Willis Corroon Group, plc, Raymond G. Viault, Brian D. Johnson, George F. Nixon, Kenneth Pinkston, Michael R. Rendle, Joseph M. Rodgers, William A. Schreyer, Patrick Lucas and Allen Sykes.

## OPINION

SCHEINDLIN, District Judge.

Plaintiff Polar International Brokerage Group ("Polar") and defendants seek court approval of their class action settlement. Polar additionally seeks an award of attorney's fees and reimbursement of expenses.

### I. Parties

Polar is the owner of twelve ADR shares [1] of defendant Willis Corroon, plc ("Willis Corroon" or the "Company"). Willis Corroon, an international insurance broker and risk management consultant, is a public limited company organized under the laws of England and Wales. Its ADSs trade on the New York Stock Exchange. See Complaint ("Cmplt.") at ¶ 6. Defendant Trinity Acquisition, plc ("Trinity"), a public limited company organized under the laws of England and Wales, is an indirectly-owned subsidiary of an investment fund formed at the direction of defendant Kohlberg Kravis Roberts & Co., L.P. ("KKR"), a leading private equity firm. See id. at ¶¶ 7–8. The individual defendants are officers and directors of Willis Corroon. See id. at ¶ 18.

### II. Background

On July 22, 1998, Trinity and Willis Corroon announced that Trinity would make a tender offer to acquire the outstanding equity of Willis Corroon for 200 pence per share, or $10 per ADS. See Affidavit of Paul C. Curnin, attorney for Trinity, KKR, and certain other defendants, dated October 16, 1998 ("Curnin Aff."), at 2; Cmplt. at ¶ 2. This tender offer represented a 12% premium over the closing price of Willis Corroon on July 21, 1998, and total consideration of approximately U.S. $1.4 billion. See Curnin Aff. at 2; Cmplt. at ¶ 2. Under the terms of the tender offer, seven senior executives of the Company were to receive 1,164,481 Willis Corroon shares and 94,604 Willis Corroon ADSs, worth an estimated total value of $3,275,002. See Cmplt. at ¶¶ 29–30.

On July 28, 1998, Polar filed a complaint in New York State Supreme Court against the same defendants named in this action. Polar alleged that through this tender offer, the defendant officers and directors of the Company agreed that the Company would be acquired by Trinity for a "grossly inadequate price" and without affording other potential acquirers an opportunity to make higher competing offers. Supreme Court Complaint at ¶¶ 1, 21. It alleged that the officers and directors, pursuant to a "preconceived plan and scheme," acted in their own self interest and have failed to act in the best interests of the company and to maximize shareholder value. Polar also alleged that defendants falsely represented the true financial condition of the Company in order to eliminate holders of ADSs at a below-market price. See id. at ¶¶ 31–34. Polar asserted claims against the defendants for breach of their common law fiduciary duties, violation of New York Business Corporation Law § 717, and common law fraud and deceit. See id. at ¶¶ 42–68.

From July 28, 1998 until September 30, 1998, this case remained "dormant." See Curnin Aff. at ¶ 5. During this time, more than 93% of all Willis Corroon equity holders, including ADS holders, tendered their ownership interests. See id. at ¶ 6. On or about September 7, the right to withdraw tendered shares expired and the tendered shares were accepted. See id. at ¶ 7. Trinity paid approximately U.S. $1.4 billion for the tendered shares.

On September 30, 1998, Polar filed a class action Complaint in this Court, which was virtually identical to the complaint filed in State Supreme Court. In this complaint, in

---

1. An ADS, or American Depository Share, represents the equivalent of five ordinary shares. Ownership of an ADS is represented by an American Depository Receipt, or ADR.

addition to claims for breach of common law fiduciary duty, violation of New York Business Corporation Law § 717, and common law fraud and deceit, Polar asserted a claim for violation of § 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act").

On October 9, Polar filed a motion for expedited relief seeking to enjoin for 30 days a meeting of the Willis Corroon shareholders that was scheduled to occur in the United Kingdom on October 19. In its motion papers, Polar argued that a fairness opinion, which was referenced in the tender offer documents and had been given by Deutsche Bank London to the independent directors of the Company, had never been distributed to shareholders. Polar argued that this fairness opinion was material to the equity holders in deciding whether to vote for the tender offer. As a result, Polar requested that the shareholder meeting be adjourned and the fairness opinion be distributed to the shareholders. Polar continued to maintain this position even though counsel for the defendants informed it prior to its filing the motion that Deutsche Bank had given its fairness opinion orally to the Willis Corroon Board of Directors and that no written fairness opinion ever existed.

On October 14, this Court declined to enjoin the meeting, finding that the meeting itself posed no threat of harm to the plaintiff. Having been informed, however, that on November 6, 1998, Trinity would acquire the remaining outstanding equity of the Company through a process known as compulsory acquisition under U.K. law, the Court scheduled a hearing for on or about October 21 to determine whether any other injunctive relief was appropriate. On the morning of the hearing, however, counsel for the parties informed the Court that the case was settled.

On December 9, Polar's motion for appointment as Lead Plaintiff and Approval of Lead Counsel was granted. On January 13, an order was signed certifying the class for purposes of the proposed settlement,[2] direct-

ing notice to the class, setting a fairness hearing and preliminarily approving the settlement. Notice was subsequently·sent to members of the settlement class. *See* Notice of Class Action Determination, Proposed Settlement and Hearing Thereon ("Notice"), attached at Ex. G to Affidavit of Samuel Sporn, plaintiff's attorney, dated March 3, 1999 ("Sporn Aff."). A fairness hearing was held on March 8, 1999.

The Notice, under the heading "Description of the Settlement," includes the following "Statement of Plaintiff Recovery":

> Plaintiff and Plaintiff's Counsel have by this litigation obtained documents and conducted oral examinations of key personnel of the Company and Deutsche Bank not available prior to the litigation herein. It is believed that Plaintiff and members of the Class have thus been able to independently conclude that the consideration for the ADRs to be paid to Plaintiff and members of the Class was not unfair or inadequate. Such independent opinion by Plaintiff's Counsel and the representation that the consideration to be paid [sic] constitutes a substantial benefit to Plaintiff and members of the Class.

*See* Notice at 2. Under the heading "Reasons for Settlement," the Notice includes the following representations:

> Counsel for plaintiff [ ] independently engaged a financial expert and conducted extensive document analysis and oral examinations of key defendant witnesses. Plaintiff's Counsel, prior to entering into this Stipulation of Settlement, examined the underlying analysis and methodology of the fairness opinion of Deutsche Bank personnel, and the minutes of the Board of Directors of Willis Corroon provided by Defendant's counsel, and, in addition, conducted in-depth, arms's-length examinations of high-ranking officers of Willis Corroon and Deutsche Bank.

**2.** The settlement class includes "[a]ll record or beneficial holders of American Depository Shares and/or American Depository Receipts of the Willis Corroon Group, plc, at any time during the period July 21, 1998 to the date hereof, and their successors in interest. . . .Excluded from the

Class are the defendants herein, members of the immediate family of each of the individual defendants, and the heirs, successors, affiliates, or assigns of any of the individual and corporate defendants." *See* Notice at 4.

The plaintiff class is to receive no monetary payment or other benefit other than the disclosure of information and confirmation described above. In exchange for this benefit, the plaintiff class agrees to release all claims that have been or could have been asserted, including claims for fraud and breach of fiduciary duty and duty of care and/or loyalty, as well as securities claims, against the defendants in any way related to the acquisition of Willis Corroon by Trinity. *See* Notice at 4–5. The parties now seek this Court's final approval of the settlement. In addition, plaintiff's counsel seeks an award of attorney's fees and expenses in the amount of $200,000.[3]

### III. Approval of Settlement

#### A. Class Action Settlements

Unlike settlements in ordinary suits, the settlement of a class action must by approved by the court. *See* Fed.R.Civ.P. 23(e). Acting as the protector of the rights of the absent class members, who will be bound by the res judicata effects of the settlement, the court must ensure that the proposed settlement is "fair, reasonable and adequate." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982); *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 462 (2d Cir.1982). In making this determination, the court's "primary concern is with the substantive terms of the settlement" and, thus, the court "need[s] to compare the terms of the compromise with the likely rewards of litigation." *Weinberger,* 698 F.2d at 73 (citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)). The trial judge must "apprise[ ] [herself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Id.* at 74. The court should not go so far as to effectively conduct a trial on the merits, but should make "findings of fact and conclusions of law whenever the propriety of the settlement is seriously in dispute." *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983).

The court's analysis has a second prong as well: the court must also look at the negotiating process leading up the settlement. This examination is necessary in order to ensure that the "compromise be the result of arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *Weinberger,* 698 F.2d at 74; *see also Malchman,* 706 F.2d at 433 (court must examine "the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves").

In determining whether a settlement is "fair, reasonable and adequate," courts in this Circuit look to the following factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974).

#### B. Use of Settlement Class

In this case, the parties sought certification of a settlement class after having reached agreement on the terms of the settlement. The use of a settlement class allows the parties to concede, for purposes of settlement negotiations, the propriety of bringing the suit as a class action and allows the court to postpone formal certification of the class until after settlement negotiations have ended. Use of this device has been expressly approved. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, ——, 117 S.Ct.

---

**3.** In the settlement agreement, defendants agreed not to take a position with respect to an applica-

tion for attorney's fees up to $200,000. The fees are to be paid by Trinity.

2231, 2247, 138 L.Ed.2d 689 (1997) ("the 'settlement only' class has become a stock device"); *Weinberger,* 698 F.2d at 73 (expressly permitting use of settlement classes).

As courts and commentators have noted, however, the use of the settlement class device raises certain concerns. When settlement occurs early in the case, the parties have less information on the strengths and weaknesses of the claims, and thus the court and class members may be hampered in their ability to determine the fairness of the settlement. "[A]n early settlement will find the court and class counsel less informed than if substantial discovery had occurred. As a result, the court will find it more difficult to access the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement." *Manual for Complex Litigation* 2d § 30.45 (3d Ed.1995). The use of this device may also raise questions about collusion and the ability of plaintiffs' counsel to represent the interests of the entire class. *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 787 (3d Cir.1995) (hereinafter *"In re General Motors"*) ("the court performs its role as supervisor/protector without the benefit of a full adversarial briefing on the certification issues. With less information about the class, the judge cannot as effectively monitor for collusion, individual settlements, buy-offs...and other abuses"); *see also Mars Steel Corp. v. Continental Illinois National Bank and Trust Co.,* 834 F.2d 677, 680 (7th Cir.1987) ("[t]he danger of a premature, even a collusive, settlement is increased when ... the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates"). In addition, courts have pointed out that where, as here, notice of the class action is sent to class members at the same time as notice of the settlement, "class members are present-

ed with what looks like a fait accompli," *Mars,* 834 F.2d at 680–81.

Thus, because of these concerns, when a settlement class is certified after the terms of settlement have been reached, courts must require a "clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it." *Weinberger,* 698 F.2d at 73; *see also County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1323 (2d Cir. 1990); *Plummer v. Chemical Bank,* 668 F.2d 654, 657 (2d Cir.1982); *Mars,* 834 F.2d at 681.[4]

## C. Substantive Fairness of Settlement

### 1. Objections (factor (2))

Out of the 5,900 notices sent to potential members of the class, only three class members objected to the settlement. One objector opposed the settlement on the ground that plaintiffs had a valid claim that the price paid for the Willis Corroon shares was inadequate. He pointed out that in a transaction that occurred approximately one month after the Willis Corroon tender offer, its competitor Sedgwick Group was acquired at a 28% premium, in contrast to the 12% premium paid for Willis Corroon ADRs. A second objector, a Willis Corroon employee as well as a former owner of ADRs, objected on the ground that the settlement was of no benefit to the class and that plaintiffs' counsel was not entitled to compensation. The third objector claimed that the lawsuit was "frivolous" and that the "suggested profiting" by plaintiffs' attorneys was "offensive."

The lack of substantial opposition weighs in favor of approving the settlement. The fact that only a very small number of class members objected to the settlement, however, is not dispositive. In assessing a settlement, the court's duty is to protect absent class members, and thus it must reject a settlement it determines to be inadequate or

---

4. When a class is certified for settlement purposes only, the court must make a determination that the requirements of Fed.R.Civ.P. 23 have been satisfied. In this situation, the "specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention." *Amchem Products,* 117 S.Ct. at 2248. This Court previously found that the class met the requirements of Rule 23(a), (b)(1) and (b)(2). *See* Order Certifying the Class for Proposed Settlement at 2. At this time, I see no need to further address the question of class certification.

unfair even if class members have not submitted any significant opposition. *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y.1998) (citing *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir.1982)).

### 2. Stage of proceedings and amount of discovery (factor (3))

In order to approve a settlement, a court need not find that the parties have engaged in extensive discovery. *Plummer*, 668 F.2d at 660. The parties must, however, have engaged in sufficient investigation of the facts to enable the court to "intelligently make ... an appraisal" of the settlement. *Id.* In addition, "the pretrial negotiations and discovery must be sufficiently adversarial that they are not 'designed to justify a settlement ... [,but] an aggressive effort to ferret out facts helpful to prosecution of the suit.'" *Martens*, 181 F.R.D. at 263 (citing *Saylor v. Lindsley*, 456 F.2d 896, 899 (2d Cir.1972)).

No formal pre-trial discovery has been conducted in this case; the parties settled prior to the filing of any responsive pleading. Plaintiff's counsel argues that it conducted a thorough and detailed investigation of the facts and legal principles at issue in the case, and that it reviewed documents, including the Deutsche Bank fairness presentation, and interviewed personnel at Willis Corroon and Deutsche Bank. It also points out that it hired its own independent financial expert to "analyze and compare" Willis Corroon with other comparable companies. Ordinarily, this investigation would offset concerns that the settlement occurred so early in the case. However, for the reasons discussed below, I am not satisfied that plaintiff has conducted an adequate investigation of the strengths and weaknesses of its case.

### 3. Ability to withstand greater judgment (factor (7))

It appears that defendants would be able to withstand a greater judgment. Although this factor is of minimal importance here, it does weigh in favor of rejecting the settlement.

### 4. Risk of maintaining class (factor (6))

Maintaining the suit as a class action through trial does not appear to be problematic. Securities fraud cases are generally amenable to suit as class actions. *See Lyons v. Scitex Corp.*, 987 F.Supp. 271, 277 (S.D.N.Y.1997). This factor is neutral.

### 5. Reasonableness of the settlement; risk of establishing liability and damages (factors (4), (5), (8), (9))

The parties do not provide any estimate of the best possible recovery plaintiff, if successful on its claims, could recover. Presumably, if plaintiff could prove that defendants engaged in securities fraud and breach of their fiduciary duties, plaintiff could be awarded a significant amount of money. On their face, the claims appear weak. However, because no formal discovery has yet occurred and because plaintiff has not presented the Court with any evidence resulting from its independent investigation, other than its conclusion that the offer price was "not unfair" and that no higher bid had been made for the Company, this Court cannot competently evaluate the merits of the claims. Even if the claims are meritorious, the risks of successfully proving liability and damages are great.

On the other side of the equation, however, I find that the proposed settlement is virtually worthless. The class members are obtaining nothing other than reassurance. The Court's role is not to ensure that the class gets the best settlement possible; it is to ensure that the settlement is fair and reasonable. On balance, I find that the settlement is not fair to the class: because they will receive nothing of value, class members are better off retaining their legal rights to maintain suit rather than accepting the settlement.

#### a. Value of the claims

##### (1) Violations of section 14(e)

Plaintiff alleges that defendants violated section 14(e) of the Exchange Act, which provides:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which

they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C.A. § 77e(c). In order to prove a claim under § 14(e), plaintiff must demonstrate that defendants were responsible for "a material misstatement or omission" and such misstatement or omission "was sufficiently culpable to justify granting relief to the injured party." *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir.1973). Thus, plaintiff must satisfy the materiality standard by showing that a reasonable investor would have relied on the alleged misrepresentation or omission in deciding to tender her shares. *See id.* at 362–63. Further, it must establish that the defendants acted with scienter, that is, that they acted with an intent to "deceive, manipulate or defraud," or with "knowing misconduct." *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538 (2d Cir.1999); *Securities and Exch. Comm'n v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996).

In addition, in order to survive a motion to dismiss this claim, plaintiff is subject to the heightened pleading standard applicable to securities fraud claims. Plaintiff must have alleged sufficient facts in the Complaint "that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir.1994). This "strong inference" may be shown "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 1128. Although this "strong inference" standard was adopted prior to the passage of the Private Securities Litigation Reform Act (the "PSLRA"), the Second Circuit recently held

that the PSLRA codified this requirement for pleading scienter. *See Press*, 166 F.3d at 537–38; *Fant v. Perelman*, 97 Civ. 8435, 1999 WL 199078, at *6 (S.D.N.Y. April 9, 1999).

Plaintiff alleges two sets of misrepresentations. First, it claims that defendants knowingly or recklessly omitted the fairness opinion from the tender offer materials. Second, it alleges that defendants intentionally and/or recklessly misrepresented the condition of Willis Corroon and failed to disclose that the Company had become strong and profitable, in order to eliminate shareholders at a below-market price. These claims appear weak—not to mention difficult to prove—and based upon the information available to the Court may not even survive a motion to dismiss. If the claim did survive, plaintiff would face the difficult task of proving that defendants acted with scienter—that they acted with knowledge or reckless disregard of the truth of the alleged misrepresentations. As both parties now admit, a written fairness opinion was never prepared. In addition, in support of its allegations that defendants misrepresented the performance of the Company in the offering materials, plaintiff cites to statements and information showing that the Company was strong and profitable. Every document on which plaintiff relies, however, is a document publicly disseminated by the Company, which belies the contention that defendants were attempting to misrepresent the condition of the Company.[5]

### (2) Common law claims

Plaintiff also alleges that defendants breached their fiduciary duties to the shareholders. Specifically, it alleges that defendants "are carrying out a preconceived plan and scheme to effectuate the [Trinity offer] for inadequate consideration to the public shareholders in order to entrench themselves in office and to thwart proper bids from third parties, so as to deprive the Willis shareholders of a fair price for their stock, proper dividends, and of maximum shareholder val-

---

**5.** Plaintiff originally asserted that Deutsche Bank London had a conflict of interest because Deutsche Bank previously purchased KKR's American reinsurance subsidiary, American Re, from KKR. Defendants asserted that a KKR-related entity sold American Re to Munich Re, not Deutsche Bank. Plaintiff later corrected itself,

and stated that its allegation of conflict rested on the fact that Deutsche Bank London's parent was, at the time of that transaction, a ten percent owner of Munich Re. *See* Plaintiff's Reply Memorandum of Law in Response to KKR's Opposition to Plaintiff's Motion for Injunction at 2 n. 1.

ue, all at the expense of plaintiff and the other members of the Class." *See* Cmplt. at ¶ 20. It also alleges that defendants "have displayed their predisposition and determination to reject and thwart tender and/or other offers and proposals by third parties other than those of their choosing." *Id.* at ¶ 47.

In its prior motion for injunctive relief, plaintiff cited in support of its claims to Delaware case law regarding directors' fiduciary obligations to stockholders. Defendants, however, are officers and directors of Willis Corroon, which is a British company. "Under the generally-recognized choice-of-law rule, questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation." *Scottish Air Int'l, Inc. v. British Caledonian Group,* 81 F.3d 1224, 1234 (2d Cir.1996) (citations omitted); *Walton v. Morgan Stanley & Co.,* 623 F.2d 796, 798 n. 3 (2d Cir.1980) ("the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation"); *see also Carr v. Equistar Offshore, Ltd.,* 94 Civ. 5567, 1995 WL 562178, at *5 (S.D.N.Y.1995) ("[c]laims for breach of fiduciary duty brought by a shareholder against an officer of a corporation are governed by the law of the state of incorporation"); *but see Norlin v. Rooney, Pace, Inc.,* 744 F.2d 255, 263 (2d Cir.1984) (suggesting that law of state other than that of incorporation may apply to corporate internal affairs in certain circumstances) [6]. Based upon the evidence in the record, it appears that plaintiff's fiduciary duty claims would be governed by the laws of Great Britain.[7]

---

[6]. In *Norlin*, the Second Circuit referred to *Greenspun v. Lindley*, 36 N.Y.2d 473, 369 N.Y.S.2d 123, 330 N.E.2d 79 (1975), in which the Court of Appeals left open the possibility that New York law could apply if there were significant contacts with New York "to support a finding of such 'presence' of the [defendant] in our State as would, irrespective of other considerations, call for the application of New York law" and suggested the following factors as relevant: where the business of the defendant is transacted, where its principal office is located and records kept, where the directors meet and what proportion of the shareholders reside in New York. *See Norlin*, 744 F.2d at 263. Even under this "significant contacts" test, there is no evidence in the record that the Company had such contacts with New York.

Based on the facts that are available to the Court, no evidence has been presented that defendants acted in breach of any duty to the shareholders. But because no formal discovery has been conducted, and because the Court is not satisfied that the parties engaged in an adversarial investigation of the facts designed to ferret out evidence that would support prosecution of the suit—I cannot conclude that the claims are meritless.

### b. Value of the settlement

Placing a value on the settlement of the claims presents a difficult question. Class members stand to gain no pecuniary benefit, or any of the injunctive relief sought in the Complaint, from the settlement of this suit. This fact, however, does not necessarily mean that class members have received nothing of value. Courts have now widely accepted the principle that settlements involving nonpecuniary benefits can be "fair and adequate"—and thus suitable for approval. One recent article on this phenomenon identified five categories of such nonpecuniary settlements that commonly arise: (1) settlements offering members coupons for discounts on future purchases of defendants' products; (2) monitoring settlements in which a fund is used to remedy future injuries attributable to defendants' conduct; (3) securities settlements in which the defendants offer stock, puts or warrants in exchange for the release of claims; (4) reverter fund settlements in which cash is paid to an escrow agent; and (5) fluid recovery settlements, in which de-

---

[7]. Generally under British law, directors owe duties to the company, and not the individual stockholders. *See* 5 Francis Beaufort Palmer, *Palmer's Company Law* § 8.501 (1998). This leading treatise states that: "there could be said to be emerging the idea that, even in the absence of agency, directors owe to the shareholders a fiduciary duty (in addition to the fiduciary duty owed to the company) in respect of the advice given and action taken by the directors in relation to the shareholders' decision whether to dispose of their shares." *Id.* at § 8.504. English courts have recognized the principle that where directors have decided that it is in the best interests of the company to be sold and there is more than one bidder for the company, the duty of the directors is to obtain the best price. *See* 2 *Palmer's* at § 12.202.

fendants contribute money to non-class members such as a charity. Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements*, 60 Law & Contemporary Probs. 97 (1997).

In addition, it is now widely accepted that various forms of "corporate therapeutics" may provide a "substantial benefit" to a corporation or its stockholders. *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 395–96, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (petitioners' establishing that corporation and its officials violated the securities laws rendered substantial service to corporation and its shareholders). This issue generally arises in the context of derivative suits, in which plaintiff's counsel seeks compensation for work that has resulted in a non-monetary benefit to the corporation even though the suit has not ended in a favorable judgment on the merits. Assessing the value of non-monetary relief is not easy. Courts have sometimes invoked the following standard in making this determination:

> the benefit must be something more than technical in its consequences and be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest.

*In re Texaco, Inc. Shareholder Litigation*, 20 F.Supp.2d 577, 592 (S.D.N.Y.1998) (citation omitted). Courts in this context have found a variety of non-monetary benefits to confer a "substantial benefit." *See, e.g., id.* (listing cases); *Mokhiber v. Cohn*, 608 F.Supp. 616 (S.D.N.Y.1985), *aff'd*, 783 F.2d 26 (2d Cir. 1986). Such benefits have included, for example, the withdrawal of a proposed amendment to a participation agreement, *Koppel v. Wien*, 743 F.2d 129 (2d Cir.1984); the submission of a stock option plan to the shareholders, *Lewis v. Anderson*, 692 F.2d 1267 (9th Cir.1982); and changes in corporate governance, *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir.1993).

The claimed benefit in this case does not fall into any of the categories of nonpecuniary settlements described above. And the concept of "substantial benefit" that has developed in the context of derivative securities suits is of little guidance here, where stockholders have tendered their shares in Willis Corroon and thus have terminated their interests in the Company. The only real interest that class members have in this situation is getting the maximum value possible for their shares.

The settlement puts no additional money in class members' pockets; what it offers is reassurance that the price they received is "not unfair." This benefit is of little value. At the time of tendering, the shareholders had been provided with a recommendation of the independent directors of Willis Corroon, who based their recommendation on the advice of Willis Corroon's financial advisor, Deutsche Bank, that the terms of the tender offer were fair and reasonable. Plaintiff's counsel argues that it has conferred an additional benefit on stockholders by presenting the additional opinion of an independent financial consultant[8] that the settlement was "not unfair" at the time the offer was made, and by receiving confirmation from Deutsche Bank that as of December 21, 1998, the price was still fair, effectively providing a "bringdown" opinion that updated the previous opinion given by Deutsche Bank.

Counsel argues that private securities actions provide a weapon in the enforcement of the securities laws, which are based on the requirement of disclosure of information, and that plaintiff has furthered this policy by obtaining additional information. The benefit conferred on the class here, however, is not substantial: By the time this suit was filed, 93% of shareholders had already tendered their shares and on September 7, 1998, the right to withdraw tendered shares had

---

**8.** It appears that this independent opinion was received by class counsel subsequent to its agreement, at least in principle, to settle: defendants' opposition to plaintiff's motion to enjoin the shareholders meeting was filed on October 16, 1998, and the parties informed the Court that the case had settled on or about October 21, 1998.

The first date that the Court was apprised of this opinion was on January 13, 1999, when the settlement agreement was submitted for the Court's preliminary approval. The earliest date on which the class members were notified was when the Notice was sent on January 19, 1999.

expired. Therefore, this information was of no benefit to class members in determining whether or not to tender their shares.[9]

Shareholders may receive some comfort in having an additional, arguably more independent, evaluation of the tender offer price. But this evaluation neither puts more money in their pockets nor provides the potential for any benefit in the future; it merely provides some psychic reassurance for an action already taken. *See In re MCA, Inc.*, 598 A.2d 687, 696 (Del.Ch.1991) (rejecting settlement providing for no monetary benefit to class and "poison pill" of "illusionary" value).

### 6. Complexity, expense and duration of litigation (factor 1)

Like most securities class actions, this case has the potential to be complex, lengthy and expensive. There would, no doubt, be significant motion practice, which, assuming plaintiff's case survived, would lead to costly and lengthy discovery, much of which is likely to be abroad. The legal issues would be complex, as they involve British insurance and takeover regulations, as well as British common law. Moreover, the parties would likely be required to hire experts on the issue of valuation of the Company. This factor favors settlement.

### 7. Conclusion

Because I find that the class has received nothing of real value—and would be better off with its legal right to pursue these claims and any others arising out of the tender offer intact—I reject the settlement.

### D. Procedural Fairness—Adequacy of Representation

■ An important component of a court's fairness determination is a determination of the adequacy of class counsel, which includes an examination of whether the negotiating process leading up to the settlement was conducted at arm's length, and whether class counsel have engaged in sufficient discovery of the claims. *Weinberger*, 698 F.2d at 74; *Malchman*, 706 F.2d at 433 (court must look to "the negotiating process, examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves"). Without a finding that these requirements have been satisfied, the court cannot be assured that the interests of the absent class members have been protected.

Here, the Court is not concerned that counsel lacks the experience or the ability to prosecute this suit; counsel has extensive experience in representing plaintiffs in securities cases. The Court, however, cannot conclude that the class has been adequately represented. First, the Court is not satisfied that counsel has adequately investigated the merits of this suit. As discussed above, it does not appear that counsel has ever researched British law applicable to directors' duties in the context of a tender offer or other corporate transaction, or to assess the merits of its claims in light of this law. Moreover, few specifics regarding counsel's factual findings and the analysis of his independent consultant were presented to the Court, other than the ultimate conclusion that the offer price was "not unfair." *See Spira v. Nick*, 94 Civ. 7066, 1997 WL 793052, at *4 (S.D.N.Y. December 29, 1997) (rejecting settlement based on inadequate representation).

Second, this settlement has earmarks of a non-arm's length, "politely" collusive settlement: one providing a nonpecuniary benefit of very little value to shareholders and a fairly substantial award of attorney's fees to plaintiff's counsel for a modest amount of work. Many courts and commentators have described the danger of a conflict of interest

---

9. In arguing that the "bring down" opinion provides a substantial benefit to the class, plaintiff cites to a New York case, in which plaintiff's counsel appeared and in which, plaintiff claims, the court approved a settlement and awarded attorney's fees in the amount of $360,000 for providing a very similar benefit for a class. *See Curran v. Mascotte*, Consol. Index No. 94–133746 (Sup.Ct.N.Y.Co. July 25, 1996), Ex. A to Affidavit of Samuel Sporn, plaintiff's counsel, dated March 3, 1999. In its Order and Final Judgment in *Curran*, however, the Court engaged in no discussion of the facts of the case, no description of the benefit received by the class from the settlement, and no explanation of its finding that the settlement was fair. The case is of minimal precedential value.

between plaintiffs' counsel in a class action suit and their clients—the class members they represent—namely, the temptation of class counsel to sacrifice procuring value for the class in exchange for maximizing attorney's fees. "The principal-agent problem that is endemic to class and derivative actions implies that there are three sets of interests involved in these actions: those of the defendants, the plaintiffs, and the plaintiff's attorneys. Often the plaintiff's attorneys and the defendants can settle on a basis that is adverse to the interests of the plaintiffs. At its worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorney's fees." John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions,* 86 Colum.L.Rev. 669, 714 (1986); *see also Plummer,* 668 F.2d at 658 ("[b]ecause of the limited control exercisable by class members, class settlements are susceptible to abuse ... The interest of lawyer and class may diverge, as may the interest of different members of the class, and certain interests may be wrongly compromised, betrayed, or 'sold out' without drawing the attention of the court") (citing *In re Beef Industry Antitrust Litigation,* 607 F.2d 167, 174 (5th Cir. 1979)).

One leading critic of class actions, Professor Coffee, argues persuasively that this problem has become even more exacerbated by the use of nonpecuniary settlements. John C. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working,* 42 Md.L.Rev. 215, 243–46 (1983) (hereinafter *"Rescuing the Private Attorney General"*). Professor Coffee examines this problem mainly in the context of derivative suits, where the incentive to agree to a non-monetary settlement of questionable value is made stronger by the fact that the corporation, rather than the individual defendants, generally pays the legal fees of plaintiff's counsel, allowing plaintiff and defendant to benefit from the settlement with little cost. The analysis, however, is equally applicable to class actions. Through the use of a non-pecuniary settlement coupled with an application for attorney's fees, defendants benefit by receiving release from suit, plaintiff's counsel benefits in the most tangible form—cash—and unless the non-monetary settlement offers something of real value to class members, they have relinquished their legal rights to maintain a suit in exchange for very little. *See In re General Motors,* 55 F.3d at 803 (overturning district court's approval of settlement where counsel received substantial fee award and settlement "involve[d] only non-cash relief, which is recognized as a prime indicator of suspect settlements"); *In re Oracle Securities Litigation,* 132 F.R.D. 538, 544–45 (N.D.Cal.1990) ("[t]he classic manifestation of the problem in a class action involves a non-pecuniary settlement (e.g., injunctive relief), 'expert valued' at some fictitious figure, together with arrangements to pay plaintiffs' lawyers their fees").

In support of the settlement, plaintiff has emphasized only that the price received by the class is not unfair and that "the Court should not substitute its judgment for that of the Company executives," essentially disparaging the strength of its claims and encouraging the Court to adopt the position that its adversary has maintained throughout this suit. *See* Plaintiff's Memorandum in Support of Proposed Settlement and for an Award of Attorney's Fees and Reimbursement of Expenses, at 22. The implication is that plaintiff's counsel, in reviewing documents and interviewing personnel of Willis Corroon and Deutsche Bank, has uncovered no evidence of wrongdoing by defendants. This argument, taken to its logical conclusion, is that the claims have no merit. If this is true, counsel is now seeking compensation in the form of attorney's fees for pursuing a meritless case. If this conclusion is not correct, and the case does have merit, the class has received virtually nothing of value in exchange for releasing any claims arising out of the transaction.

Third, the speed with which the settlement was reached counsels against a finding of adequacy. The state court action was filed in July 1998, but according to defendants it remained "dormant." *See* Curnin Aff. at ¶ 5. The action in this Court was brought on September 30. The Court rejected plaintiff's initial request for injunctive relief on October

14. The parties announced that they had settled on or about October 21. It is not clear from the record whether plaintiff conducted any of its document review or interviews before or after it agreed to settle, but given the short period of time involved, it appears likely that such investigation occurred subsequently.

This Court is cognizant of the policies favoring settlements, particularly in potentially complex, lengthy class actions suits such as this one. *See Weinberger,* 698 F.2d at 73 (noting the "general policy favoring the settlement of litigation"). Most obviously, settlements conserve judicial resources, a valuable commodity! In addition, parties should be encouraged to settle suits earlier, rather than later, before significant amounts of money have been spent on attorney's fees and other transaction costs.

Another consideration, which has recently received significant congressional attention, is the reduction of exposure of corporate defendants to securities class actions suits of little merit, otherwise known as "strike suits." Admittedly, disapproving the settlement presented here deprives defendants of a release from claims arising out of the tender offer and, should the current plaintiff (or another) decide to pursue these claims, exposes them to further expense, which is a significant concern if plaintiff's claims have as little merit as the parties would now lead the Court to believe. Certainly, $200,000 in the context of a $1.4 billion transaction is a small price to pay for immunity, particularly when compared to the costs of defending against a suit alleging securities fraud.

This goal, however, is not furthered by approving settlements that provide quick, easy money to plaintiffs' attorneys and nothing to shareholders. A practice of rubber stamping settlements of dubious merit that give attorneys significant fee awards but do not require defendants to contribute anything will, in the long run, encourage the filing of more frivolous suits. Moreover, it

may reduce the deterrent value of lawsuits: "the ultimate danger is that the corporate law-breaker will know that, even if detected, it can bribe the plaintiff's attorney—who represents the real threat of financial sanction—through the medium of the nonpecuniary settlement coupled with a high fee award." *Rescuing the Private Attorney General,* 42 Md.L.Rev. at 246.[10]

## IV. Attorney's Fees

■ Plaintiff's counsel has moved for an award of $200,000 in attorney's fees and expenses. In arriving at this figure, counsel has relied on the "lodestar" approach to calculating attorney's fees, in which the number of hours reasonably spent on the case is multiplied by the prevailing rate for the services provided.

The lodestar method of calculating fees in securities suits has been expressly approved in this Circuit. *Savoie v. Merchants Bank,* 166 F.3d 456, 460 (2d Cir.1999); *Grinnell,* 495 F.2d at 470–71. Some courts in this Circuit have applied the alternative "percentage-of-the-fund" method for use in common fund cases. The Second Circuit has not yet expressed its view on the propriety of using this method. In a recent case, it noted that the Supreme Court "has implied that the percentage-of-the-fund method is a viable alternative," but the Court declined to rule on the appropriateness of its application in that case. *Savoie,* 166 F.3d at 460.

The PSLRA provides a further gloss on the awarding of attorney's fees in the securities litigation context. The Act provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for plaintiff shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *See* 15 U.S.C. § 78u–4(a)(6); 15 U.S.C. § 77z–1(a)(6). The statute does not dictate a particular method for calculating fees; the language suggests, rather, an overarching limi-

10. At this point, the parties may renegotiate settlement, proceed with the lawsuit or voluntarily dismiss the suit. The last option requires the permission of the court. *See* Fed.R.Civ.P. 23(e). Given the views expressed herein, it is fair to conclude that a dismissal would be approved.

Such a course would not prevent individual class members from proceeding if any chose to do so. However, if plaintiff chooses to proceed, it should be mindful of the PSLRA's requirement of a mandatory Rule 11 review at the conclusion of any case. *See* 15 U.S.C. § 78u–4(c)(1).

tation on the final amount awarded. This interpretation is consistent with the legislative history of the Act, which is replete with testimony about Congress' concern that counsel in securities class action lawsuits receive a "disproportionate share" of settlement awards. *See* H.R. Conf. Rep. No. 104–369, at 36 (1995) ("The Conference Committee does not intend to prohibit use of the lodestar approach as a means of calculating attorney's fees. The provision focuses on the final amount of fees awarded, not the means by which such fees are calculated"); S.Rep. No. 104–98, at 12 (1995) ("By not fixing the percentage of attorney's fees and costs that may be awarded, the Committee intends to give the court flexibility in determining what is reasonable on a case-by-case basis. The provision focuses on the final amount of damages awarded, not the means by which they are calculated"); *see also Lyons*, 987 F.Supp. at 279 (provision "is intended to prevent the payment of attorney's fees based on an inflated settlement figure, where a large part of the settlement is later returned to the coffers of the settling defendant because of a low number of claims").

An interesting problem is presented when a court must determine the "reasonable percentage" of a non-monetary settlement whose value is not readily calculable. Under the circumstances, however, I do not need to reach this issue. Because the settlement is rejected and because I find that the class has received nothing of any real value, plaintiff's counsel's request for attorney's fees and expenses is denied.

## V. Conclusion

Because the Court does not find that the settlement is fair and reasonable, and because the Court is not satisfied that the class has received adequate representation, the settlement is rejected. Plaintiff's counsel's application for attorney's fees and reimbursement of expenses is also rejected.

SO ORDERED.